| | |
|---|---|
| H.B., a minor student, by and through her Father, D.B., and her mother, S.B., and D.B. and S.B., individually ) ) ) ) Plaintiffs, ) ) vs. ) ) RUTHERFORD BOARD OF EDUCATION, ) A/K/A RUTHERFORD COUNTY SCHOOLS, ) ) Defendant ) | No. _____ JURY DEMAND |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF (42 U.S.C. § 1983)

**COME THE PLAINTIFFS, H.B.**, through her parents, D.B. and S.B., by and through their attorney, filing this Complaint against Rutherford County Board of Education, a/k/a Rutherford County Schools. They show:

### I.    PARTIES, JURISDICTION, AND VENUE

1.      H.B. is a fifteen year old teenager zoned to a public school in the Rutherford County School system; she resides in Rutherford County, Tennessee, with her parents, D.B., her father, and S.B., her mother. The initials H.B., D.B., and S.B. are used to protect the educational privacy of a minor child.

2.      Rutherford County Board of Education, a/k/a Rutherford County Schools ("RCS"), the Defendant, is vested with the control and operation of the public school system within Rutherford County, Tennessee.  It receives state and federal funding to provide education to students.

1

3.     The Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and the United States Constitution.

4.     Venue is proper as all of the pertinent facts took place in Rutherford County, inside this Court's judicial district, and all parties reside or are located in Rutherford County.

## II.   INTRODUCTION

5.     This case involves a one-year expulsion from alleged threats under a "Reasoned Judgment" policy adopted by RCS.

6.     Unfortunately, RCS maintains an official policy or custom of withholding critical student threat assessment information from parents, including exonerating information created before the disciplinary appeals are heard.

7.     The policy of refusing to release the exonerating information was adopted and enforced by final policymakers and was the moving force behind the deprivation of the Plaintiffs' Fourteenth Amendment rights: by denying H.B. access to material exculpatory evidence necessary to challenge the expulsion and by preventing H.B.'s parents from obtaining critical information concerning their child's mental health and suicidal ideation.

## III.   FACTS

### *RCS's Zero Tolerance Policy*

8.     The Tennessee legislature passed a "zero tolerance" statute for schools—"certain, swift, and proportionate punishment"—for these four offenses: (1) firearm possession; (2) controlled substance possession; (3) aggravated assault/assault causing bodily injury on staff; and (4), and a valid threat of mass-violence threat. Tenn. Code Ann. §49-6-3401(g)(2).

2

9. These four offenses carry a rigid one-year expulsion, modified only by the Director of Schools after the fact. *Id*. at (g)(6)(B). The statute does not require expulsion for threats (except valid threats of *mass violence*), for pocketknives, pottery knives, or weapons *other than* a firearm.

10. RCS's Board passed Policy 6.309, titled "Zero Tolerance Offenses." That policy states the automatic expulsion for the four categories set forth in Tenn. Code Ann. §49-6-3401(g)(2), to be modified only by the Director of Schools.

11. Additionally, under Policy 6.309, RCS added "Reasoned Judgment Offenses." While Policy 6.309 states that Reasoned Judgment offenses are "other zero tolerance offenses," they are not; as the name indicates, Reasoned Judgment Offenses recognize that "individual circumstances … may warrant a reasoned judgment by the Principal in assigning discipline." The two "Reasoned Judgment Offenses" are (1) "weapons other than firearms," which requires the Principal to consider the object, circumstances, and intent of the student; and (2) "other instruments and substances" that are used "with the intent to do harm to self or others."

12. On April 9, 2025, RCS issued a "Suspension Notification" stating a Reasoned Judgment Offense of "*Weapon Other Than Firearm*" after a safety check found a "knife found in her bag." This knife was part of a pottery kit, used for shaping, cutting and molding clay. It is 'number 5' in this picture of the entire pottery clay kit:



13. That day, April 9, 2025, after consulting the principal, the assistant principal advised the parent that H.B. was suspended but "she had the opportunity to appeal to request a modification." A threat assessment was then scheduled for April 11, 2025. According to the Deputy Director of Schools, this suspension was "pending the threat assessment."

14. On April 11, 2025, two days later, RCS conducted a school "threat assessment" with a multi-disciplinary team that included the assistant principal, social workers, a school psychologist, teachers, H.B., and H.B's parents, and a member of law enforcement.[1]

15. Although H.B. and her parents participated *in* the threat assessment, RCS would not advise H.B. or her parents the information learned or the *result* of the threat assessment. RCS knew—but H.B. and her parents did not—that RCS determined that H.B. did *not* pose a serious threat, but rather the lowest level, "transient," under the CSTAG.

16. This threat assessment examined the circumstances thoroughly: in addition to a thorough interview of H.B., and the parents too, it included H.B.'s academic record, her friends and social groups, her discipline history, any preparation for the threat, prior conflicts with the target, access to a firearm, accomplices, gang activity, history of violence, anger or resentment, whether harassed or bullied, whether depressed, positive relationships with friends and family. Not only was the threat transient, the law enforcement officer issued no charge.

17. Despite these thorough results, RCS's principal did not take any action under the Reasoned Judgment procedures to modify the 365-day expulsion. Rather, on April 14, 2025, RCS

---

[1] RCS uses the Comprehensive School Threat Assessment Guidelines (CSTAG) developed at the University of Virginia, which determines whether a student *poses* a true threat of violence or has, instead, made a "transient" threat. Under CSTAG guidelines, a "transient" threat is a "statement that does not express a lasting intent to harm someone." As the CSTAG guidelines state: "Threat assessment is ultimately concerned with whether the student *poses* a threat, not whether the student has *made* a threat. Any student can make a threat, but relatively few will engage in behavior that indicates the planning and preparation necessary to carry out the threat."

4

issued another Notice of Suspension, this one adding that the parents were unaware of any knife in the backpack.

18.     On or about Monday, April 21, 2025, RCS's principal (Ms. Sneed) and assistant principal (Ms. Cousin) advised H.B.'s parents that, yes, the threat assessment was an educational record of the student, but its results and content will not be released for consideration in the disciplinary appeal. Because it was an education record, they directed H.B.'s parents to seek it through the RCS legal department.

19.     Accordingly, H.B., through her parents, did seek the results from, and information learned in, the threat assessment—this educational record—through RCS legal department. They intended to examine the results for both the disciplinary appeal and care of their child.

20.     The RCS legal department refused to release it.  The department explained that the information could not be released to parents because it contains the *questions*, which would compromise integrity of the assessment (which is a publicly available CSTAG). By claiming the *questions* were secretive, RCS denied the substantive information obtained that was directly relevant to H.B. herself. H.B.'s parents sought *that,* but were still denied.

**The Appeal**

21.     H.B. also exercised her right to appeal the expulsion from public school (her property interest), still not knowing the results or information contained within the *threat* assessment.

22.     On May 2, 2025, H.B., through legal counsel now, requested the threat assessment and inspection of evidence. Counsel explained she could not adequately present her appeal without knowing this information, and the parents could not adequately support her at home either.

5

23. After some delays in obtaining a hearing date, on May 20, 2025, a Disciplinary Hearing Authority panel advised H.B. that "Zero Tolerance" *precluded* it from modifying the 365-day discipline (even though "Reasoned Judgment" is actually the standard). The DHA panel advised that any modification would have to be made to the Director of Schools and then the School Board. H.B. still could gain no access to the threat assessment results.

24. H.B. did appeal to the Director of Schools. And on May 28, 2025, the Director of School upheld the 365-day decision pursuant to H.B.'s appeal—again without H.B. having access to the threat assessment results.[2]

25. H.B. appealed again, this time to the Board, with the Board setting a hearing for July 24, 2025. In preparation for the hearing, and still not knowing the results of the April 11, 2025 threat assessment, H.B. again requested that information from RCS's legal department—but no response. She also filed a complaint with the United States Department of Education for withholding the threat assessment and, again, sought the information from the legal department. It *still* was not produced.

26. On Thursday, July 24, 2025, RCS convened a Board Hearing for H.B.'s Notices dated April 11 and 14, explaining the format—statements, testimony, and presentation of evidence. The Board should have been considering the application of Board Policy 6.309, "Zero Tolerance offenses," with its "Reasoned Judgment" section. Under that section, the school's principal must consider "the *circumstances* surrounding the incident" and the "*intent* of the student." And the Board has authority, after the evidenced adduced at the hearing, to affirm the decision, modify it "in any manner," or impose a more severe penalty pursuant to Board policy 6.317.

---

[2] The Director's letter cited a different basis and different date that did not relate to H.B. at all— "Level IV Misbehavior on May 20, 2025" not "Zero Tolerance."

27.    At the hearing, H.B. and her parents displayed the circumstances of the pottery knife, with the other pottery-implements depicted above. And though not lawyers themselves, they referenced the Sixth Circuit's *Seal v. Morgan* case involving an expulsion for a knife—arguing H.B. never intended any harm to anyone with her pottery knife.

28.    The assistant principal (Ms. Cousin) and the principal (Ms. Sneed) appeared and gave testimony too. Unlike H.B. and her parents, they *did* know of the threat assessment results and information obtained. Contrary to "Reasoned Judgment" Sneed testified that it was not the job of RCS to understand *context*.  And contrary to Deputy Director Martin (suspension "*pending* threat assessment"), Cousin stated that information from the April 11 threat assessment *cannot be considered* for the discipline RCS issued April 9 and April 14.

29.    Under "Reasoned Judgment," it is precisely RCS's administration's (the principal's) job to determine the circumstances, any intent, and to use "reason" and "judgment." And nothing in Board Policy 6.309 (or Code of Conduct 6.300) limits consideration of information about the object, the circumstances, and the intent of the student that was gained on April 11, 2025, between the two Notices of Discipline dated April 9 and 14, respectively. The multi-tiered process is to ensure the *student* is protected against erroneous suspension, not protecting administrators who gain exculpatory information after the initial discipline.

30.    Where a school provides an administrative appeal before the disciplinary action becomes administratively final, due process is not served by refusing to consider material exculpatory evidence that becomes available before that appeal is decided.

31.    RCS *knew* substantial information about the circumstances through the threat assessment, but they refused to reveal its use to the parents.  In truth, it was not just the opinion of H.B., but the opinion of the entire school-based *team* that H.B.'s remarks were "transient" and

7

lacked any plan or intention to carry them out. But this key information bearing on "circumstances" and "intent" was kept secret from both the parents and the very body examining that question. Not only were H.B. and the parents demanding it, the Board, too, wanted to know whether that information should have been given to the child. RCS said no.

32. At the conclusion of the hearing, RCS said it would hold its deliberations and then vote on August 5, 2025, in spite of the evidence surrounding the threat being withheld.

33. On August 4, 2025, H.B., through her parent, went to all Board members directly, in writing, for help obtaining the threat assessment results. She wrote:

> I also wanted to make sure you were aware that we still have not been given access to [H.B.'s] educational records regarding her threat assessment evaluation. Our first formal request for those was on April 21st. That request was denied, and follow-up requests were ignored, which is part of why we've escalated [H.B.'s] case to this point. We informed Ms. Ridley on June 18 that we had filed a complaint with the federal Student Privacy Policy Office after repeated unacknowledged requests to her office. She did not respond or acknowledge that message, either.
>
> We've been given no legal basis for our denial of access to [H.B.'s] records, and I don't understand how that denial can be justified or viewed as being in our family's best interest. We just want to support our kids as best we possibly can.
> …
> Can the board please consult with its own resources to help us either obtain those records for our child, or compel Ms. Ridley to provide us with a valid legal basis for their continued withholding from us?

34. RCS still refused to produce the threat assessment to H.B., her parents, or the voting members of the School Board.

35. On August 5, 2025, as scheduled, the School Board voted to uphold H.B.'s expulsion by a vote of 5-2. This was based on existence of, "evidence supporting decision," with denial of access to the exonerating threat assessment.[3]

36. At the conclusion of the hearing, legal counsel for the Board advised H.B.'s parents that the "reason" RCS would not produce threat assessments, even to parents, is the fear that, if disclosed to a parent or board member, a newspaper or third party might receive it too. But providing information to parents does not require public disclosure—the assessment is not for the public. Tenn. Code Ann. §49-6-2701(f). Just as assuredly, it is available to parents as an educational record under FERPA. *Id*. at (d),(e).

37. H.B.'s parents respectfully disagreed that the practice to shield such information was appropriate (or legal). This policy or practice stood in violation of her right to obtain a meaningful hearing and access to key evidence bearing upon a full year expulsion. This was particularly true for a student having suicidal ideations—in need of parental protection.

38. Lacking subpoena power, H.B. lacked the ability to *force* disclosure of the threat assessment performed on H.B., upon the very subjects controlling the reasoned judgment for an expulsion. However, by filing an administrative due process claim under the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act, H.B. was finally able to compel disclosure of her threat assessment results—now October of 2025. By that time, RCS had expelled H.B. since April of 2025 and into the following school year.

39. The results of the CSTAG threat assessment were clearly and obviously relevant and material to H.B.'s intention, the circumstances, and application of reasoned judgment under

---

[3] The "Committee Findings" state "zero tolerance" was for a "Level IV Misbehavior."

9

Board Policy 6.309. Contrary to testimony of Cousin and Sneed, and the presentation of arguments by RCS, the assessment showed the circumstances of H.B.'s threat to be transient, with H.B. having no plan or any intention to carry out a threat. Further circumstances described her as being suicidal and requiring a "suicide assessment," information also kept from the parents.

40. The continued denial of access to this record—clearly addressing the circumstances of H.B.'s expulsion—precluded her from showing the expulsion should be modified under the law and Board policy. By suffering outright expulsion, H.B. suffered loss of educational opportunities, reputational harm, emotional distress, and continuing stigma associated with being labeled a violent threat when, in fact, she was not. H.B.'s parents were injured too, not knowing important information about their daughter, while incurring costs and attorneys' fees to obtain this information.

41. The constitutional violations are not that of a "rogue" individual, but clearly an official policy that RCS was following, over and over, to prevent parents from receiving exculpatory information, but also medically needed information, on grounds of feigned public disclosure. It is also a custom of tolerance, as RCS admits it was adhering to the normal practice of denying access to the threat assessment to parents and throughout the appeal process. Accordingly, the constitutional violations resulted from official policies, customs, or final policymaking decisions of Defendant RCS, including the disciplinary appeal process that affirmed the expulsion despite possession of exculpatory evidence. The appeal decisions of the Director of Schools and the Board constituted final municipal action under Section 1983.

## IV. LEGAL CLAIMS

### COUNT I: DENIAL OF PROCEDURAL DUE PROCESS

42. Plaintiff possessed constitutionally protected property and liberty interests in her continued public education and freedom from government-created stigma.

43. Public-school students facing expulsion or suspension are entitled to due-process protection. *Goss v. Lopez*, 419 U.S. 565, 581 (1975); *Newsome v. Batavia Loc. Sch. Dist.*, 842 F.2d 920, 927 (6th Cir. 1988). H.B. was entitled to an explanation of the evidence, with protection against "unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Goss*, at 581.

44. RCS intentionally, or with deliberate indifference, withheld clearly exculpatory and material evidence in its possession throughout the disciplinary appeal proceedings. And it provided information *contrary* to the threat assessment findings of which it was a part. This is clearly not the unbiased presentation required of fundamentally fair procedures.

45. The withheld threat assessment was not collateral to RCS's disciplinary determination. It addressed precisely the two factors—"the circumstances surrounding the incident" and "the intent of the student"—that Board Policy 6.309 requires the decisionmaker to weigh before imposing punishment for a Reasoned Judgment Offense. The assessment's conclusions went directly, and only, to the questions RCS's own policy made dispositive of the length and severity of H.B.'s discipline.

46. RCS's decisionmakers did not merely lack access to the threat assessment; they were affirmatively provided testimony that contradicted its conclusions. Cousin and Sneed, who knew the assessment's results, testified that H.B. intended to cause harm—the opposite of what the multi-disciplinary team, of which they were members, had determined. The DHA panel, the

11

Director of Schools, and the Board therefore did not independently evaluate the same underlying facts known to RCS and reach their own conclusion; they were presented with testimony RCS's own agents knew to be contrary to the very record RCS controlled and refused to produce.

47. This conduct rendered RCS's decisionmakers biased, not merely uninformed. A biased decisionmaker is constitutionally unacceptable in a school disciplinary proceeding, and any presumption of impartiality afforded such bodies is rebutted by evidence of actual bias—here, contrary testimony knowingly offered by officials who possessed, and concealed, the true facts.

48. RCS denied H.B. access to the threat assessment finding that she did not present a valid threat of violence with intent to harm, and denied her access to critical information within the assessment. As a result, the appeal with its "secrecy" on the most material item was *not* meaningful.

49. Defendants deprived Plaintiff of due process of law in violation of the Fourteenth Amendment.

### COUNT II: DENIAL OF SUBSTANTIVE DUE PROCESS—PARENTAL RIGHT TO PARTICIPATE IN DECISIONS REGARDING THEIR CHILD'S MENTAL HEALTH (D.B. AND S.B., INDIVIDUALLY)

50. The Fourteenth Amendment forbids government actors from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. This guarantee protects certain fundamental liberties not expressly listed in the constitutional text, including a parent's right to direct the upbringing, education, and care of her child. *Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925).

51. That right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal

12

quotation marks omitted), and it has been repeatedly reaffirmed, including within the past year. *See Mirabelli v. Bonta*, 607 U.S. ___, ___ (2026) (per curiam) (slip op., at 5–6); id. at ___ (Barrett, J., concurring) (slip op., at 1–2).

52.     Among the decisions this right protects is a parent's right not to be excluded from participation in decisions regarding her child's mental health. *Parham v. J.R.*, 442 U.S. 584, 601–04 (1979); *see also, Mirabelli,* 607 U.S. at ___ (Barrett, J., concurring) (slip op., at 2) (State policy that "excludes parents from highly important decisions about their child's mental health" is unlikely to survive heightened scrutiny).

53.     D.B. and S.B. are H.B.'s parents and, under the Fourteenth Amendment and Tennessee's Constitution, possess the primary right and responsibility to direct decisions regarding H.B.'s mental health and well-being. Tenn. Const. art. XI, § 12.

54.     On April 11, 2025, as part of RCS's threat assessment team, officials determined that H.B.'s mental health and safety *was* compromised: that H.B. required a "suicide assessment." This was a mental health concern for a child—not a genuine threat to others, but H.B. needed mental health assistance *herself.*

55.     RCS did not disclose this determination, or any underlying fact supporting it, to H.B. or her parents. RCS excluded H.B. and her parents from this information for approximately six months—from April 11, 2025 until October 2025—despite repeated written and verbal requests to RCS, to its legal counsel, a formal appeal to the Board, a complaint to the U.S. Department of Education, and a direct written appeal to all sitting Board members. This caused substantial angst, fear, uncertainty, and distress for the parents.

56.     RCS's exclusion of D.B. and S.B. from information central to their child's mental health and safety—including RCS's own recommendation that H.B. undergo a suicide

assessment—is indistinguishable in kind from the exclusion condemned in *Parham* and, by extension, in *Mirabelli*, and violates D.B. and S.B.'s substantive due process right to participate in decisions regarding their child's mental health needs.

57.     RCS's policy and practice of categorically withholding threat assessment information from parents, regardless of the mental health information they contain and regardless of parental request, cannot survive the heightened scrutiny that governs infringement of this fundamental right. RCS's asserted interest in avoiding disclosure to third parties does not justify withholding the assessment from the parents constitutionally entitled to participate in decisions about their own child's mental health.

### COUNT III: DENIAL OF SUBSTANTIVE DUE PROCESS—ARBITRARY AND CONSCIENCE-SHOCKING DEPRIVATION OF EDUCATIONAL LIBERTY AND PROPERTY INTERESTS (H.B.)

58.     Separate and apart from the parental right addressed in Count II, H.B. herself possesses a liberty and property interest in her public education and in freedom from government-imposed stigma, and the Fourteenth Amendment protects her from executive action that is arbitrary, irrational, or that "shocks the conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998).

59.     Under RCS Board Policy 6.309, a "zero tolerance" 365-day expulsion is subject to a "reasoned judgment" exception requiring the decisionmaker to consider "the circumstances surrounding the incident" and "the intent of the student."

60.     RCS's own threat assessment—the single piece of evidence most relevant to both "circumstances" and "intent"—concluded that H.B.'s conduct was a "transient" threat, meaning she had no plan or intention to carry out any threat of violence.

61.     Despite the existence of this determination, RCS's decisionmakers—the DHA panel, the Director of Schools, and ultimately the Board—intentionally, or with deliberate

14

indifference, imposed and repeatedly affirmed the full 365-day expulsion without ever considering, or permitting consideration of, the threat assessment's conclusions, while affirmatively withholding those conclusions from the very body charged with applying "reasoned judgment."

62.     A disciplinary decision that mechanically imposes the maximum available penalty while its decisionmakers are deprived of—or affirmatively withhold from themselves—the evidence their own policy requires them to consider is arbitrary and is not a rational or reasoned exercise of the discretion RCS's policy calls for.

63.     RCS's conduct—concealing exculpatory evidence concerning a minor's mental health and suicide risk from the very panel deciding whether to expel her for a full calendar year—shocks the conscience and deprived H.B. of substantive due process.

64.     A substantive due process violation exists where there is no rational relationship between the punishment and the offense. *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000). Because Policy 6.309 conditions the severity of punishment for a Reasoned Judgment Offense on the decisionmaker's individualized assessment of intent and circumstances, the offense itself—for purposes of substantive due process—is defined by those factors, not by the isolated fact of possession alone. Where, as here, decisionmakers imposed the maximum available penalty based on testimony they knew, or had reason to know, misrepresented H.B.'s actual intent and circumstances, the resulting 365-day expulsion bears no rational relationship to the offense RCS's own policy defines.

**V.  RELIEF**

15

**WHEREFORE**, Plaintiffs H.B., D.B., and S.B. respectfully request that this Court enter judgment in their favor and against Defendant Rutherford County Board of Education, a/k/a Rutherford County Schools, and grant the following relief:

a. Declare that Defendant's withholding of the April 11, 2025 threat assessment from H.B. and her parents throughout the disciplinary appeal process, and its practice of categorically denying parents and students access to such records, violated H.B.'s right to procedural due process under the Fourteenth Amendment;

b. Declare that Defendant's policy and practice of categorically withholding threat assessment records and the mental-health information contained within them from parents violated D.B.'s and S.B.'s substantive due process right to direct and participate in decisions concerning their child's mental health and care;

c. Declare that Defendant's imposition and repeated affirmance of H.B.'s 365-day expulsion—without consideration of exculpatory evidence that Board Policy 6.309 itself required the decisionmaker to consider—was arbitrary, irrational, and conscience-shocking, in violation of H.B.'s substantive due process rights;

d. Enter permanent injunctive relief ordering Defendant to expunge the expulsion and all related disciplinary records from H.B.'s educational file;

e. Permanently enjoin Defendant from continuing its policy, custom, or practice of withholding threat assessments and other exculpatory evidence from students and their parents during disciplinary proceedings, and order Defendant to adopt policies and procedures ensuring timely disclosure of such evidence in future proceedings;

16

f. Award H.B. compensatory damages, in an amount to be determined at trial, for reputational harm and stigma from being labeled a violent threat, emotional distress, and other injury caused by Defendant's unconstitutional conduct;

g. Award D.B. and S.B., individually, compensatory damages, in an amount to be determined at trial, for the emotional distress and other injury caused by their unconstitutional exclusion from decisions regarding their child's mental health and safety, and for the expenses they reasonably incurred, including legal fees, in seeking to obtain H.B.'s educational records and to vindicate the family's constitutional rights;

h. Award Plaintiffs their reasonable attorneys' fees, expert fees, and costs pursuant to 42 U.S.C. § 1988;

i. Award pre-judgment and post-judgment interest as allowed by law; and

j. Grant such other and further relief as the Court deems just and proper.

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,

**GILBERT LAW, PLC**

/s Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423.756.8203
justin@schoolandworklaw.com

17